Slip Op. 11-81

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| AWP INDUSTRIES, INC.,<br>ITC MANUFACTURING, INC.,<br>J&L WIRE CLOTH, INC.,<br>NASHVILLE WIRE PRODUCTS MFG. CO.,<br>INC.,WIREWAY HUSKY CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendants,<br><br>- and -<br><br>DALIAN EASTFOUND METAL PRODUCTS<br>CO., LTD., DALIAN EASTFOUND<br>MATERIAL HANDLING PRODUCTS CO.,<br>LTD., WORLDWIDE MATERIAL HANDLING<br>PRODUCTS, LLC,<br><br>Defendant-<br>Intervenors. | Before: Pogue, Chief Judge<br><br>Court No. 10-00250<br><br>**Public Version** |

**OPINION**

[Plaintiffs' motion for judgment on the agency record is DENIED; judgment entered for Defendant.]

Dated: July 12, 2011

Kelley Drye & Warren LLP (Kathleen W. Cannon and R. Alan Luberda)for Plaintiffs.

James M. Lyons, General Counsel, U.S. International Trade
Commission; Andrea C. Casson, Assistant General Counsel for
Litigation; (Charles A. St. Charles), Office of the General
Counsel, for Defendant.

DeKieffer & Horgan (Gregory S. Menegaz and Marc E.
Montalbine)for Defendant-Intervenors.

**Pogue, Chief Judge:**  In this action, Plaintiffs seek review

of the International Trade Commission's ("the Commission")

finding of no material injury, or threat thereof, to the domestic

industry, as a result of imports of wire decking from China.

Plaintiffs challenge, as unsupported by substantial evidence in

the record, the following five factual determinations (the

"subsidiary findings") relevant to the Commission's ultimate

negative determination:  1) the Commission's choice of

questionnaire response data to determine subject import market

share; 2) the Commission's determination that subject imports

were not suppressing domestic prices to a significant degree; 3)

the Commission's conclusion that the domestic industry's

declining performance was largely due to a decline in demand for

wire decking; 4) the Commission's reliance on Chinese producer

questionnaire responses in its determination regarding Chinese

capacity; and 5) the Commission's determination that the largest

importer of wire decking had ceased operations.

As explained below, the court concludes that the

Commission's five subsidiary findings do not reflect an

unreasonable reading or analysis of the record evidence regarding

the economic conditions affecting the domestic industry during

the Commission's 2006-2009 period of review.  Accordingly, the

Commission's decision is affirmed.

### JURISDICTION

The court has jurisdiction over this case pursuant to

28 U.S.C. § 1581(c).[1]

### BACKGROUND

The economic conditions affecting the domestic industry are,

of course, the critical focus for a Commission's determination of

whether a U.S. industry is being materially injured, or

threatened with material injury, by reason of subject imports.

See 19 U.S.C. § 1671d(b).[2]  Specifically, in making its final

determination, the Commission is required to consider the volume

of subject imports, their effect on prices in the United States

for the domestic like product, and the impact on domestic

---

[1] 28 U.S.C. § 1581(c)(2006) grants this court "exclusive jurisdiction of any civil action commenced under section 516A of the Tariff Act of 1930[,]" including the review of a negative injury determination made by the Commission. See 19 U.S.C. § 1516a(a)(2)(A)(ii)(I),(a)(2)(B)(ii).  All further citations to the Tariff Act of 1930 are to Title 19 of the United States Code, 2006 edition.

[2] Under the "by reason of" standard of causation, subject imports must have more than an "incidental, tangential or trivial" effect on the industry. See Nippon Steel Corp. v. Int'l Trade Comm'n, 345 F.3d 1379, 1381 (Fed. Cir. 2003); see also Gerald Metals, Inc. v. United States, 132 F.3d 716, 721-22 (Fed. Cir. 1997); Mittal Steel Point Lisas Ltd. v. United States, 542 F.3d 867, 873 (Fed. Cir. 2008).

producers within the context of U.S. production, see 19 U.S.C. §

1677(7)(B).  Additionally, in examining the impact of subject

imports, the Commission "evaluate[s] all relevant economic

factors which have a bearing on the state of the industry in the

United States[.]" 19 U.S.C. § 1677(7)(C)(iii).[3]

    The Commission's review of the economic conditions affecting

the domestic industry covers the three-year period prior to the

-------------------------------------------------

[3] In examining the impact required to be considered under
subparagraph (B)(i)(III), the Commission shall evaluate all
relevant economic factors which have a bearing on the state of
the industry in the United States, including, but not limited to-

    (I) actual and potential decline in output, sales, market
share, profits, productivity, return on investments, and
utilization of capacity,

    (II) factors affecting domestic prices,

    (III) actual and potential negative effects on cash flow,
inventories, employment, wages, growth, ability to raise capital,
and investment,

    (IV) actual and potential negative effects on the existing
development and production efforts of the domestic industry,
including efforts to develop a derivative or more advanced
version of the domestic like product, and

    (V) in a proceeding under part II of this subtitle, the
magnitude of the margin of dumping.

The Commission shall evaluate all relevant economic factors
described in this clause within the context of the business cycle
and conditions of competition that are distinctive to the
affected industry.

19 U.S.C. § 1677(7)(C)(iii).

request or petition for an investigation ("POI").[4]  The

investigation at issue here was initiated on June 5, 2009, when

AWP Industries, Inc. ("AWP"), ITC Manufacturing, Inc. ("ITC"),

J&L Wire Cloth, Inc. ("J&L"), Nashville Wire Products Mfg. Co.,

Inc. ("Nashville Wire") and Wireway Husky Corp. ("Wireway"),

(collectively the "Domestic Industry," "Petitioners," or

"Plaintiffs"), filed petitions with both the U.S. Department of

Commerce ("Commerce") and the Commission, alleging that the U.S.

wire decking[5] industry was being materially injured or was

threatened with material injury by reason of Chinese imports.

The Domestic Industry also alleged that Chinese producers were

selling their wire decking product at less than fair value

("LTFV") while receiving subsidies from the Chinese government,

---

[4] See Frontseating Service Valves from China, USITC Pub. 4073,
Inv. No. 731-TA-1148, at 10 n.44 (April 2009)(Final).  The
Commission extended the POI from three to four years for this
investigation at the request of Petitioners. Pet'rs Comments on
Draft Questionnaires (Dec. 29, 2009)(CL 85); see also  Def.'s
Mem. in Opp'n to Pl.'s Mot. for J. on the Agency R. 4 n.2
("Def.'s Br."); Mem. by Def.-Intervenors in Opp'n to Mot. for J.
on the Agency R. 5 n.3 ("Def.-Int.'s Br.").  Thus, the POI at
issue included the four years 2006-2009.

[5]  Wire decking is a fabricated decking assembly used as a
shelf surface in a rack storage system for warehouse, commercial
or industrial storage. Wire Decking from China, USITC Pub. 4172,
Inv. Nos. 701-TA-466 and 731-TA-1162, at 5 (July 2010) ("Final
Views"); Def.'s Br. 4.  The Commission defined the domestic like
product as consisting of all wire decking and the domestic
industry to include all domestic producers of wire decking. Final
Views 7, 10; Def.'s Br. 4.

thus causing material injury to the U.S. industry.[6]

Generally, to put the investigation in context, during this POI, from 2006-2009, "nonresidential construction activity slumped . . . , w[ith] industrial production bottom[ing] out in mid-2009." Final Views at 15.  Thus, the Commission was faced with determining the effects of the subject imports in a generally declining economic environment that reduced demand. Nonetheless, during the preliminary investigation, the Commission found "a causal nexus between the subject imports and the deteriorating condition of the domestic industry." Views of the Commission in the Preliminary Investigation 27 (CR 70)(PR 47)("Prelim. Views").  In the final phase of its investigation, however, the Commission – after receiving questionnaire responses from foreign producers, domestic producers, importers and purchasers, in addition to evidence submitted by Petitioners – determined that the domestic industry was not being materially injured or threatened with material injury by reason of wire decking from China.  Rather, to the Commission, the industry's

---

[6] Plaintiffs participated in the Commission's administrative proceedings, as did Nucor Corporation ("Nucor"), another domestic producer.  Defendant-Intervenors, Respondents Dalian Eastfound Metal Products Co., Ltd. and Dalian Eastfound Material Handling Products Co., Ltd. (collectively, "Eastfound") and Worldwide Material Handling Products, LLC ("Worldwide")(collectively, "Respondents" or "Defendant-Intervenors") also participated.

difficulties were due to other economic factors or conditions.[7]

Notably, the Commission sent questionnaires to ten domestic wire decking producers identified by Petitioners, and received eight responses, seven of which provided usable information. Petitioners estimated that the seven usable responses accounted for approximately 99 percent of U.S. wire decking production in 2008. Confidential Staff Report for the Final Investigation III-1 n.1 (June 17, 2010)(CR 180)("Final Staff Report"). In addition, for the final phase of the investigation, the Commission sent questionnaires to thirty-six U.S. wire decking importers, and again received seven usable responses from firms reporting wire decking imports. The Commission stated that these responses were reported to account for "the majority" of imports during the relevant period. Final Views 3-4; see also Final Staff Report at IV-1. Further, the Commission received twenty-six purchaser responses and sent forty-eight final questionnaires to foreign

_____

[7] Commissioners Lane and Williamson dissented, finding that the United States industry was being materially injured by reason of the subject imports. Dissenting Views of Commissioners Charlotte R. Lane and Irving A. Williamson, at 1-16 (CR 187) ("Dissenting Views"). The dissent concluded that "if subject imports had been fairly traded[,] there would have been a beneficial impact on the domestic industry, either in price increases, volume increases, or both," and that therefore the domestic industry's difficulties were, to a sufficient degree, due to subject imports. Id. at 16. To the dissent, the domestic industry was able to maintain its position during declining economic conditions only by keeping its prices low. Id. at 6.

The notice of the Commission's final determination was published on July 30, 2010. Wire Decking from China, 75 Fed. Reg. 44,988 (July 30, 2010)(PR 131).

producers believed to produce wire decking in China during the

POI, receiving four responses.[8]  Final Staff Report at VII-2.

The Commission believed that these responses accounted for the

vast majority of Chinese production and exports to the U.S. in

2009. Final Views 4.[9]

    After briefly summarizing the court's familiar standard of

review, this decision will discuss each of the Commission's

subsidiary findings that Plaintiffs challenge here.


### STANDARD OF REVIEW

    Where an action is brought under 19 U.S.C. § 1516a(a)(2)

seeking review of a final determination of the Commission under

19 U.S.C. § 1673d, "[t]he court shall hold unlawful any

determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise

not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1).  The

substantial evidence standard of review "can be translated

roughly to mean 'is [the determination] unreasonable?'" Nippon

---

    [8] One of these responses came from Eastfound.

    [9] Specifically, the Commission believed that these responses
accounted for approximately [[  ]] percent of Chinese production
and [[  ]] percent of Chinese exports to the U.S. in 2009. Final
Views 4; Final Staff Report VII-2-VII-5.  The staff report
contains no explanation for the fact that the reported percentage
of Chinese production is higher than the percentage of Chinese
exports.

Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir.

2006) (alteration in original) (quoting SSIH Equip. S.A. v. U. S.

Int'l Trade Comm'n, 718 F.2d 365, 381 (Fed. Cir. 1983)),

"tak[ing] into account whatever in the record fairly detracts

from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474,

488 (1951).

The Commission steps outside of its authority when:

> [T]he agency has relied on factors which Congress has not
> intended it to consider, entirely failed to consider an
> important aspect of the problem, offered an explanation for
> its decision that runs counter to the evidence before the
> agency, or is so implausible that it could not be ascribed
> to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.

Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867 (1983).


## DISCUSSION

### I. Volume & Market Share

In considering the economic conditions facing the domestic

industry, the Commission relied on data from importer

questionnaire responses, finding that, while the volume of

subject imports was significant both in absolute terms and as a

share of apparent U.S. consumption, the subject imports' market

share increase - less than two percentage points from 2006 to

2009 - was not significant. Final Views 19-20; Def.'s Br. 13.[10]

Plaintiffs argue that the Commission's reliance on the data from those importers who submitted questionnaire responses and its failure to consider wire decking imported from non-responding companies, in order to determine import volumes and sales, was unreasonable when considered in light of the evidence in the entire record.  Plaintiffs claim that the questionnaire responses that the Commission received from importers were insufficient as a data set and thus "understated and mischaracterized import volumes and market share trends." Pl.'s Rule 56.2 Mem. of Law in Support of Mot. for J. on the Agency R. 12 ("Pl.'s Br.").[11]

Particularly, Plaintiffs assert that the questionnaire response data failed to account for a shift in marketing of subject imports, including the fact that those non-responding firms were the same new importers that had begun importing directly from China in 2008-2009. Pl.'s Br. 13; Pl.'s Reply Br. 2.

The Commission asserts that the questionnaire responses

---

[10] See 19 U.S.C. § 1677(7)(C)(i) ("In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.")

[11] Plaintiffs do not take issue with using a data set of less than 100%, but rather with what they see as evidence on the record that the responses were not indicative of actual market conditions. Pl.'s Br. 14.

accounted for the largest importers and a majority of subject
imports and that the questionnaire responses were certified on
submission. Def.'s Br. 14.   As the Commission found
questionnaire data to be the most reliable, it credited this data
set. Id.

Countering the Commission's claims, Plaintiffs provide data
estimates for imports missing from the Commission's data set.[12]
Plaintiffs state that, due to these omissions from key importers,
the Commission's data set showed "declining volumes and a
relatively steady import market share" as opposed to increasing
imports that had a detrimental effect on the U.S. wire decking
industry.   Pl.'s Br. 16.[13]

The Commission responds that even by Plaintiffs'
calculations, the responses still account for the great majority
of subject imports. Def.'s Br. 15.[14]   In addition, the Commission
addressed Petitioners' concern regarding importers, stating that
three of the importers that provided responses in the
preliminary, but not the final phase of investigation, accounted
for only a minor number of subject imports. Final Views 20

---

[12] Plaintiffs claim that almost [[  ]] percent of import
data, from twelve companies alone, was missing from the
Commission's calculations. Pl's Br. 15.

[13]  Plaintiffs contend that the Commission's calculation
that import market shares were steady affected its entire
determination. Id. at 21-22.

[14] At least [[  ]] percent of all 2009 subject imports.

n.89.[15]  In addition, Respondents stated that three of the firms

that reported data to the Commission[16] made up 90 percent of U.S.

imports during the POI, Final Staff Report IV-1 n.1, thus

"account[ing] for a large majority of subject imports." Def.'s

Br. 15.

The Commission adds that it did not supplement its data with

official statistics "because official import statistics are based

on basket categories of the HTS that are too broad to provide

import data specifically for wire decking." Final Views 20.[17]

Thus, of the thirty-six importers to receive questionnaires, not

all of them necessarily imported the subject merchandise because

wire decking is classified under a broad, or "basket" HTSUS

category. Def.'s Br. 16; see also Final Staff Report at I-8-I-

9.[18]

The Commission also asserts that it did not use Plaintiffs'

import estimates because those estimates "do not distinguish

---

[15]  Only [[   ]] percent.

[16]  [[                                          ]]

[17] Further, the Commission notes that it is common to not
receive a full set of responses, and the normal practice is to
rely on the response data, particularly when, as here, the
Harmonized Tariff Schedule of the United States("HTSUS") does not
provide a "statistical breakout" that would allow for relying on
official import statistics. Def.'s Br. 1-2.

[18] HTSUS 9403.90.80.40.  Defendant notes that there
currently exists a specific statistical breakout for wire
decking, but that the breakout did not exist during the POI.
Def.'s Br. 16 n.3.

between imports and import shipments[.]" Final Views 21; Def.'s

Br. 19.  Petitioners themselves had recognized this distinction.

Def.'s Br. 19; see also Pet'rs Posthr'g. Br. at 6 n.14 (June 4,

2010)(CR 175).  The Commission states that import shipments can

be more reliable because they include only those imports that

actually enter the market as opposed to those that are stored in

inventory. Def.'s Br. 19-20; see also Comm. for Fair Coke Trade

v. United States, 28 CIT 1140, 2004 WL 1615600, at *15 (2004).

The Commission notes that Petitioner's constructed import tables

were also unpersuasive, as they appeared to overstate the total

subject imports during the POI. Def.'s Br. 20.

        Reiterating its finding that official import statistics

based on "basket categories" do not provide accurate data on wire

decking imports alone because they include other products, the

Commission concluded that it could not corroborate the

Plaintiffs' estimates. Final Views 22.

                        * * *

        It is clear to the court that the Commission did address

Plaintiffs' concerns about the limitations of questionnaire

response data from importers.  First, the Commission acknowledged

the data gap. Id. at 21, n.90.[19]  The Commission credited the

_____

[19] "Although the ITC concedes its information was not
complete, e.g., that 20% of U.S. imports from China were not
accounted for by the questionnaire responses, the ITC 'is not
required to gather 100% coverage in the questionnaire responses
before it can make a determination.' United States Steel Group v.

fact that, notwithstanding the lack of complete response data,

the sworn statements of the responding importers were still the

most reliable information on the record, as they accounted for

the majority of subject imports and certified as accurate. Final

Views 20-21.[20]  The fact that information has been certified is a

reasonable explanation for using that information in lieu of

relying upon other evidence, and the Commission's decision to use

certified information over other "reported figures" is a

reasonable exercise of its discretion. See Timken Co. v. United

States, 28 CIT 277, 321 F. Supp. 2d 1361, 1365-67 (2004).

    Second, the Commission addresses Plaintiffs' concern that

the questionnaires, without Petitioners' additional estimates, do

---

United States, 18 CIT 1190, 1203, 873 F. Supp. 673, 688 (1994)
(in context of final determination); Torrington Co. v. United
States, 16 CIT 220, 223-24, 790 F. Supp. 1161, 1166 (1992), aff'd
991 F.2d 809 (Fed. Cir. 1993) (finding in the context of a
preliminary determination that the ITC did not abuse its
discretion by using questionnaire responses that 'represented a
substantial majority of domestic production')." Comm. for Fair
Coke Trade v. United States, 28 CIT 1140, 2004 WL 1615600, at
*15-16 (2004).

    [20] Plaintiffs state that information they submitted was
based on first-hand knowledge, as well as certified and sworn
under oath.  The court reads the Commission's preference in this
case for certified data over other evidence to refer to the
Petitioners' import estimates, recognizing that Plaintiffs'
submitted information from producers and declarations includes
sworn documents and testimony given under oath. Pl.'s Reply Br.
5-6; see also Pet'rs Posthr'g Br. Ex. 6 (Petitioners' import
estimates table); Hr'g Tr. 21-22, 35, 80-81 (May 27, 2010)(PR
100)(producers' information); Pet'rs Posthr'g Br. Exs. 7, 8, 12,
13 & 16 (declarations).

not accurately show the trends over the relevant period.    In

addition to obtaining four additional responses from importers,

the Commission states that many of the initial thirty-six

importers did not import the subject merchandise, had stopped

doing so, or did so in nominal quantities. Def.'s Br. 16-17,19;

Final Staff Report IV-1 n.2; Final Views 20 n.89.

The Commission concludes that any potential for skewed data

was actually overstated – because Atlas[21] remained the importer

of record even when firms that purchased wire decking from Atlas

were identified as consignees. Final Views 22 n.95; Final Staff

Report IV-1 n.1; Hr'g Tr. 159-160; Resp'ts Posthr'g Br. 7 & App.

2, at 14-16 (Decl. of Victor Kedaitis[22])(CR 176)(June 4, 2010).

In particular, Respondents provided evidence regarding two

firms[23] – accounting for a large amount of what Petitioners

claim to be missing data.  This evidence indicated that firm one

was always a customer of Atlas (and Nashville Wire) was never an

importer of record; the other is believed to be out of business.

Final Views 22 n.95.  Two other firms mentioned by Petitioners[24]

---

[21] Atlas was the largest U.S. importer of wire decking
during the relevant period.  The issue of whether Atlas has
ceased operations is discussed further below.

[22]  Mr. Victor Kedaitis is President and CEO of Worldwide
and a former Atlas general manager and vice president.

[23]  [[                                          ]]

[24]  [[
       ]]

likely do not exist anymore. Id.; see also Resp'ts Posthr'g Br.
App. 2, at 14-15 (Decl. of Victor Kedaitis). As such, Atlas
reported those imports in its questionnaire. Def.'s Br. 18; Final
Views 22 n.95.

In addition, the Commission argues that Plaintiffs' evidence
is not as reliable as Respondents' documentation, including the
Kedaitis declaration, indicating that Petitioners' volumes are
overstated. Def.'s Br. 21-22. Thus, the Commission decided to
credit this sworn witness testimony in lieu of Petitioners'
estimates in making its determination. Id. at 18, 22.

Plaintiffs argue that this explanation was insufficient and
add that their reported evidence of importation was more valid.
Pl.'s Br. 14, 19-20 n.5. However, it is not within the court's
purview to weigh the evidence presented, but rather to assess
whether the Commission reasonably considered the record in making
its determination. U.S. Steel Grp. v. United States, 96 F.3d
1352, 1357 (Fed. Cir. 1996)(maintaining that the Commission, as
the trier of fact, has broad discretion in assigning relative
weight weight to each piece of evidence). The possibility of
drawing two inconsistent conclusions from the evidence does not
render the agency's determination unreasonable, Consolo v. Fed.
Mar. Comm'n, 383 U.S. 607, 620 (1966); where "[s]ubstantial
evidence exists on both sides of the issue[,] . . . the statutory
substantial evidence standard compels deference to the [agency]."

Nippon Steel Corp. v. United States, 458 F.3d 1354, 1354 (Fed.
Cir. 2006).

Here, the Commission reasonably addressed Plaintiffs'
concerns regarding the importers' questionnaire response rate,
gave a reasonable explanation for why it used the questionnaire
data set as opposed to Petitioners' recommended information, and
reasonably considered the relevant factors and evidence in the
record.   Therefore, the Commission's determination regarding
import volumes and market shares, based on importer
questionnaires, was supported by substantial evidence on the
record.[25]

---

[25] Plaintiffs also attempt to claim that, as a matter of
law, the Commission conducted an inadequate investigation because
it failed to 1) follow its unanswered questionnaires with either
emails or telephone calls in order to corroborate the response
data on the record, Pl.'s Br. 25; 2) utilize its subpoena power,
see 19 U.S.C. § 1333; see also 19 C.F.R. § 207.8 (2010); 3) or
draw adverse inferences against or otherwise penalize non-
cooperative respondents.
     But there is no indication here that the Commission failed
to conduct a diligent and adequate investigation or failed to
consider a crucial issue. See Atl. Sugar, Ltd. v. United States,
744 F.2d 1556, 1561 (Fed. Cir. 1984)("Nothing in the best
information rule or its legilsative [sic] history defines a
standard of investigative thoroughness."); see also Hercules,
Inc. v. United States, 11 CIT 710, 743, 673 F. Supp. 454, 482
(1987)("There appears to be no recognized or statutorily set
minimum standard by which the thoroughness of the investigation
is measured.").
     To the extent that the Plaintiffs suggest that adverse
inferences should have been drawn, under the statute, the
Commission is not required to make adverse inferences in this
circumstance, where no finding of a failure to cooperate has been
made, and it is unusual in any case for the Commission to do so.
GEO Specialty Chems., Inc. v. United States, Slip Op 09-13, 2009
WL 424468, at *6 (CIT Feb. 19, 2009)("The Commission is not

## II. Price Suppression & Underselling

In evaluating the price effects of subject imports, the Commission must consider whether significant underselling and price depression has occurred.[26]  Here, the Commission found significant underselling by subject imports,[27] but did not find that the subject imports caused the suppression of domestic like product prices. Final Views 24-25.

Plaintiffs claim that the Commission's determination that subject imports did not significantly suppress U.S. prices is not supported by the record, arguing that the influx of subject

---

required to draw an adverse inference against a party who 'has failed to cooperate by not acting to the best of its ability to comply with a request for information,' although it may do so." (citing 19 U.S.C. § 1677e(b)).  Rather, the Commission "draw[s] reasonable inferences from the evidence it finds most persuasive." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 at 869, reprinted in 1994 U.S.C.C.A.N. 4040, 4198 ("SAA").

[26] **(ii) Price**
　　In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—
　　　(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and
　　　(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).

[27] The Commission found that imports undersold the domestic like product in 85 out of 93 quarterly price comparisons.  Final Views 23-24.

imports into the U.S. market led to a price suppression and
corresponding financial losses for the domestic industry.  Pl.'s
Br. 28.

     Plaintiffs specifically point to evidence that six
responding purchasers reported that U.S. purchasers have lowered
their prices since January 1, 2006, in order to compete with
subject imports, Pl.'s Br. 27; Final Staff Report V-28, that only
three purchasers stated that they did not reduce prices, and that
two reported that falling prices were due to the general decline
in steel product prices. Final Staff Report V-28.

     On the other hand, the Commission found that, while margins
of underselling ranged from .9 to 54.4 percent, only a limited
number of lost sales and lost revenue allegations were confirmed.
Final Views 24 & n.106.[28]  The Commission attributed the falling
price of wire decking in 2009 to declining demand, the
availability of substitutes and the significance of non-price
factors, rather than the effect of subject imports. Def.'s Br.
2,29-30.  Thus, the Commission concluded that the subject imports
did not significantly affect domestic prices during the relevant
period. Final Views 25.

     As support for its conclusion, the Commission points to the

_____

     [28] Plaintiffs argue that the reason for this lack of
confirmation is that "most purchasers simply did not respond to
the ITC at all." Pl.'s Reply Br. 12.  Plaintiffs also point to
their own evidence which they interpret as confirming lost sales.

fact that the domestic industry's unit cost of goods sold

("COGS") was only slightly higher in 2009 than 2006 and that the

evidence did not show that the subject merchandise prevented

price increases which would have occurred otherwise. Final Views

24; Def,'s Br. 29.   The Commission explained that, despite the

volume of subject imports, domestic producers were able to raise

prices to cover a large amount of the increase in unit COGS in

2008 which had resulted from the increased cost of raw materials,

and that even as demand declined sharply they were able to cover

a large share of COGS in 2009. Final Views 24-25; Def.'s Br.

30.[29]  Thus, the Commission relied on the domestic industry's

apparent success in increasing prices during a market decline in

relation to the COGS.

More generally, the Commission determined that the record

did not show that subject imports prevented prices from

increasing, but rather that declining demand[30] and the

availability of substitute products[31] limited price increases.

---

[29] Defendant-Intervenors argue that producers were able to
"fully cover increases in raw material costs," Def.-Int. Br. 22-
24, 26, noting that the Domestic Industry's margins of per-unit
sales values over raw material costs stayed steady or increased
over the POI. Def.-Int. Br. 9 (table and citations for the data
included therein).

[30] The decline in demand limited the volume of sales across
which producer's could allocate costs. See Final Views at 24
n.109.

[31] "[A] substantial share of producers, importers and
purchasers reported" the availability of substitute products for

Final Views 24.

The court will consider, in turn, each aspect of the factors
the Commission found important on this issue.

### A. Declining Demand

No party challenges the Commission's finding that declining
demand had an effect on the domestic industry and its ability to
raise prices during the POI. See Final Views 24-25; Pl.'s Br. 31;
Def-Int. Br. 21.

### B. Substitutes

Plaintiffs contend that, contrary to the Commission's
assertions that substitute products for wire decking exist, "fire
codes, insurance requirements and building codes did not
generally permit use of such products." Pl.'s Br. 29.   The
domestic industry testified that "[t]here are no real practical
substitutes for wire decking in the U.S. market . . . wire
decking is duly required by insurance companies and building
codes for use in commercial storage systems." Hr'g Tr. 16-17;
Pet'rs Prehr'g Br. 6 & Ex. 2 (CR 166, 170) (PR 91); Dissenting
Views 4 & n.20.   Plaintiffs note that only ten percent of thirty-
one responding purchasers reported price effects from the
substitute products. See Pl.'s Br. 30; Dissenting Views 4; Final

_____

wire decking. Final Views 24 n.110.

Staff Report II-12.[32]

The Commission states in its Final Views, however, that a "substantial" number of purchasers, producers and importers reported that there are substitutes available for wire decking products in some cases, making "aggregate demand for wire decking moderately elastic" and limiting the amount that the price of wire decking could be raised to cover increased COGS. Final Views 24 & n.110.

The Commission states that, contrary to the Plaintiffs' reference to testimony regarding fire codes, insurance requirements and building codes, a large number of producers, importers and purchasers reported a variety of products that were in fact wire decking substitutes. Def.'s Br. 32; Final Views 17 n.76, 24 n.110.[33]  The Commission argues that it did not overstate the significance of substitute products, admitting that substitutes were only available in some applications. Final Views

---

[32] Specifically, only [[                              ]], and only [[    ]] of thirty-one responding purchasers reported price effects from the substitute products. Pl.'s Br. 30; Dissenting Views 4; Final Staff Report II-12. Moreover, one of these purchasers was reported to have identified a wire decking substitute; but the product that was apparently identified, [[    ]], is an input into [[          ]] wire decking, not an actual substitute product. Dissenting Views 4 n.18; Pl.'s Br. 30 n.9.

[33] Including: pallet rack supports, warehouse shelving, non-supported wire mesh, wood, metal/steel decking, cross bars, expended metal corrugated decking, bard grading and rack dex-perforated decking. Final Staff Report II-12.

24 n.110; Def.'s Br. 32.  Rather, evidence of substitutes was one

of the factors in its determination, considering the evidence on

the record. Def.'s Br. 32-33.

     As Plaintiffs mention in their brief, there is record

evidence that these products may not have been substitutable in

practice, and a vast majority of questionnaire responses

indicated that a change in the price of substitute products does

not affect wire decking prices. Final Staff Report II-12.

However, the standard is whether a reasonable mind, considering

all of the record evidence, could have made the same

determination as the Commission.  In light of the record evidence

cited by the Commission, it was not unreasonable for it to give

some weight to the affect of substitute products on prices

charged by the domestic industry.  Although the record would have

permitted the opposite conclusion, it did not mandate such an

opposite result.

### C. Price

     Regarding price, the Commission argues that while Plaintiffs

did point to six instances of purchasers that responded that they

had reduced prices in order to compete with subject imports,

there were also two purchasers that stated that falling prices

were due to the decrease in all steel product prices; one

purchaser also stated that domestics sell "for the same or for

less" than the imported wire decking. Final Staff Report V-28;

Def.'s Br. 30.  In addition, the Commission notes that it did

consider these responses, but that other evidence – indicating

that general steel price decreases were to blame and that

domestic purchasers were selling for equal or lower prices –

weighs against Plaintiffs' argument.

   The Commission adds that the majority of purchasers did not

report switches to imports due to lower pricing and that a

majority of purchasers also reported that differences aside from

price were frequently important in their purchasing decisions.

Def.'s Br. 30; Final Views 17; Final Staff Report Table II-19.

   Despite evidence of price sensitivity, the Commission noted

that a majority of purchasers reported that non-price factors

were frequently significant in their purchasing choices,

bolstering its claim that the significance of underselling was

limited. Final Views 25 n.113.

   The Commission acknowledges that subject imports and

domestic like products were highly interchangeable, and that the

record showed that price was an important factor in purchasing

decisions. Id. at 23.  The Commission also recognizes the

significant underselling (margins up to 54.4 percent) and that

subject imports undersold U.S. producers in 85 out of 93

comparisons.  The Commission nonetheless explains that these

factors are less important than demand declines and substitutes

products. Def.'s Br. 31.

In response, Plaintiffs reiterate that their evidence was consistent with reports by U.S. producers that imports were suppressing prices in the domestic industry, including reports that U.S. producers had to lower prices to keep pace with Atlas's low selling price. Pl.'s Br. 27-28 n.8.  Plaintiffs argue that the domestic industry suffered financial losses because it could not keep its prices in line with costs. Id. at 28; Pl.'s Reply Br. 10.  This logic is supported by evidence indicating that wire decking, as "a commodity product, [is] sold largely on the basis of price." Dissenting Views 3.

In the final analysis, however, the Commission chose to attribute substantial weight to the fact that the domestic industry continued to be able to raise prices sufficiently to cover much, if not all, of its increasing costs.  Although the record evidence could have supported a different conclusion,[34] the court cannot find that the Commission's conclusion was unreasonable.  The Commission did not ignore the contrary evidence nor did it fail to consider the important factors relevant to this issue.  On the contrary, it assessed the economic conditions and chose to place weight on particular

---

[34] The court notes that the dissenting Commissioners found "clear and consistent evidence of price suppression[,]" such as the ratio of COGS to net sales, which moved against the domestic industry during the POI. Dissenting Views 8-9.

evidence in the record.[35]  Again, the role of this court is not

to re-weigh the evidence presented to the Commission, but rather

to assess if its determination was reasonable given the evidence

on record.

   The Commission must reasonably consider all of the evidence

on the record, make a conclusion based on a reasonable reading of

all that evidence, and reasonably explain its reasoning for

finding underselling but not price suppression.  The Commission

did so here.

   **III. Decline in Demand and its Impact on the Domestic**

**Industry**[36]

---

   [35] The parties dispute the significance of the statistical
and price variance evidence on the record. Pl.'s Br. 28-29; see
also Final Staff Report VI-8-VI-9; Def.-Int. Br. 24-25;
Eastfound/Worldwide Final Comments 3-6 (CR 183).  Variance
analysis is a tool that the Commission may use during an
investigation. See Hynix Semiconductor, Inc. v. United States, 30
CIT 1828, 1834 n.5, 474 F. Supp. 2d 1338, 1344 n.5 (2006)(noting
that the Commission "routinely utilizes a variance analysis to
isolate the effects of changes in price, volume, and unit cost").
The Commission states that it addressed Plaintiffs' remarks
regarding the variance analysis and its connection with price
suppression by stating in its Final Views that "[a]lthough the
ratio of COGS to net sales increased between 2006 and 2009, the
record does not establish that subject imports prevented price
increases that otherwise would have occurred." Final Views 24;
Pl.'s Br. 28; Final Staff Report IV-8-9; Def.-Int. Br. 24-25.

   [36]  The statute places the following requirements on the
Commission's consideration of the:

   **(iii) Impact on affected domestic industry**
    In examining the impact required to be considered under
   subparagraph (B)(i)(III), the Commission shall evaluate all
                                           (continued...)

The Commission acknowledges that domestic industry

performance declined during the POI, but concludes that subject

---

[36] (...continued)
relevant economic factors which have a bearing on the state
of the industry in the United States, including, but not
limited to—
> (I) actual and potential decline in output, sales, market
> share, profits, productivity, return on investments, and
> utilization of capacity,
> (II) factors affecting domestic prices,
> (III) actual and potential negative effects on cash flow,
> inventories, employment, wages, growth, ability to raise
> capital, and investment,
> (IV) actual and potential negative effects on the
> existing development and production efforts of the
> domestic industry, including efforts to develop a
> derivative or more advanced version of the domestic like
> product, and
> (V) in a proceeding under part II of this subtitle, the
> magnitude of the margin of dumping.

The Commission shall evaluate all relevant economic factors
described in this clause within the context of the business
cycle and conditions of competition that are distinctive to
e affected industry.


19 U.S.C. § 1677(7)(C)(iii).

Plaintiffs state their claim on this issue as follows: "The
Commission erred in concluding that the injury suffered by the
domestic industry was attributable entirely to demand and not to
subject imports." Pl.'s Br. 30.  The answer to this claim, as
stated, is that it fails to address a flaw the Commission's
determination.  The Commission's determination was that "the
declines in the domestic industry's sale volumes and revenues are
**largely** explained by declining demand over the period examined."
Final Views at 27 (emphasis added).  The difference is
significant because Plaintiffs' exaggerated statement disregards
the analysis the Commission actually followed; Plaintiffs'
statement therefore cannot be sustained.  Accordingly, the court
will assume *arguendo* that the Plaintiffs intended to challenge
the agency's actual analysis on this issue.

imports, while having a "significant presence in the market,"
were not responsible "in any significant degree" for this
decline. Final Views 27; Def.'s Br. 33.   Rather, declining demand
during the POI was largely responsible for the decrease in
domestic sales and revenues, while the subject imports' market
share remained steady during the examined period. Final Views 27,
30.   Specifically, the industry's declining performance was the
result of "[[         ]]" declining revenues that illustrated a
decline in demand, moderate demand elasticity and increases in
the COGS/sales ratio. Id. at 27; Def.'s Br. 33.

The Commission observes that U.S. shipments of subject
imports declined at a rate comparable to the rate of decline of
domestic producers' shipments during the POI and that subject
imports did not take significant market share from the domestic
industry. Final Views 27.   The Commission notes that, contrary to
Plaintiffs' claim that the decline of subject imports coincides
with the investigations, the decline began in 2008, and the data
does not show that the decline in imports correlates with an
improvement in the industry's financial condition. Final Views 19
n.85.   In addition, during the investigation, "[p]etitioners and
respondents agreed that U.S. consumption of wire decking is tied
closely to total U.S. industrial output and the growth of big-box
retailing and that the current recession has certainly dampened
these activities." Final Staff Report IV-6.   Thus, while industry

conditions were "unfavorable," the Commission concluded that the evidence did not show the "requisite causal nexus between the subject imports and the condition of the domestic industry." Final Views 28.

Objecting to the Commission's conclusion, Plaintiffs reiterate their claim that the Commission failed to connect the subject imports to the decline in the U.S. wire decking industry because it did not account for all of the imports and their displacement of domestic market share, especially in 2009. Pl.'s Br. 31. Plaintiffs do not believe that the recession can account for the entirety of the industry's declining condition.[36]

Plaintiffs state that had the Commission properly accounted for all imports, it would have found that subject imports were in fact significantly displacing U.S. producers' sales and market share. Pl.'s Br. 31.[37] Plaintiffs contend further that once antidumping duties were imposed against importers in 2010, imports of their products ceased and the U.S. industry saw improvement in its profits despite a lack of increase in demand. Pl.'s Br. 33; see also Pet'rs Posthr'g Br. Ex. 1, at 37-42, Ex. 3 (CR 175,178).

---

[36] Plaintiffs argue that in 2008-2009 consumption declined by [[   ]] percent, but operating profits declined by [[   ]] percent. Pl.'s Br. 32; see also Final Staff Report at C-3.

[37] The court has, of course, rejected this specific claim in its discussion of Issue I above.

As support for their argument, Plaintiffs rely on other instances where the Commission found that a decline in demand was only partially to blame for the declining financial situation of a United States industry.  In one example, Plaintiffs cite to an investigation in which a decline in demand may have explained performance declines only partially, but not fully. See Commodity Matchbooks from India, USITC Pub. 4117, Inv. Nos. 701-TA-459 and 731 TA-1155, at 18 (Dec. 2009)(Final).  As Defendant indicates, however, the Commission's determinations are *sui generis*, and the particular facts and evidence of each case will determine the outcome.[38]  The issue here is whether the Commission reasonably interpreted the record evidence.  Just because the Commission found a decline in demand to be insufficient to explain the industry condition in a previous case does not mean that it must do so here.  Rather, the Commission reasonably states that those investigations involved improved performance during the POI, when there was a more extensive data set; they are therefore inapplicable to the present matter. Def.'s Br. 35.

According to Plaintiffs, the fact that the subject imports largely ceased after the imposition of preliminary duties in 2010 and the industry condition improved thereafter proves a causal nexus between the subject imports and the domestic industry's

---

[38]  Both Defendant and Defendant-Intervenors distinguish Commodity Matchbooks from India from the present matter. Def.'s Br. 34; Def.-Int. Br. 28.

condition.  In response, the Commission notes that because the

data set ends in 2009, no such trend is indicated during the POI.

Final Views 19 n.85; Def.'s Br. 35.

    The Commission is correct.  While it has the discretion to

use post-POI data to bolster POI data or to further support its

decision,[39] there is no requirement to include such post-POI

data, as the POI is the centerpiece of the investigation's time

frame.[40]  Thus, the 2010 data, while a potential factor, is not

fatal to the Commission's determination.  Moreover, the fact that

a preliminary antidumping or countervailing duty order assisted

the domestic industry does not, by itself, mandate the conclusion

that the subject imports were a significant cause of injury.

    In sum, because the Commission gives a reasonable

explanation for its decision, based on a reasonable reading of

the record evidence, it is not the court's place to re-weigh the

evidence or to suggest that another alternative was the only

---

[39] Bratsk Aluminum Smelter v. United States, __ CIT __, 533
F. Supp. 2d 1348, 1353 (2008)("The Court finds therefore that the
ITC has addressed the causation issue specifically and in detail
as required by *Gerald Metals* and *Bratsk CAFC* and that the POI
price data when taken together with the post-POI data adequately
supports the conclusions that the ITC has made."); see also 19
U.S.C. § 1677(7)(I).

[40] The Commission is mandated however to consider whether
data submitted after the filing of a petition has been distorted
by the filing of trade actions and the imposition of preliminary
duties. 19 U.S.C. § 1677(7)(I); see also SAA at 853-54, 1994
U.S.C.C.A.N. at 4186; Nucor Corp. v. United States, 414 F.3d
1331, 1341 (Fed. Cir. 2005).

appropriate choice.  Under the statute, in order to find a causal

nexus between the subject imports and the domestic industry's

condition, the Commission must find that the subject imports had

more than a tangential, trivial or incidental effect on the

industry. See supra note 2.[41]  In making its determination, the

Commission should "examine all relevant evidence" and "need not

isolate the injury caused by other factors from injury cased by

unfair imports...[r]ather, the Commission must examine other

factors to ensure that it is not attributing injury from other

sources to the subject imports." SAA at 851-52.  It has done so

here.

    Here, as was concluded in the discussion of Issue I above,

the Commission appropriately relied on import questionnaire data

in its analysis of the impact of the subject imports on the

domestic industry.  Plaintiffs point to other investigations and

data that, they argue, shows the requisite causal nexus between

the subject imports and the industry conditions.  However, the

Commission found, based on a reasonable reading of the record,

---

    [41] "Bratsk did not read into the antidumping statute a
Procrustean formula for determining whether a domestic injury was
'by reason of' subject imports. It simply required the Commission
to consider the 'but for' causation analysis in fulfilling its
statutory duty to determine whether the subject imports were a
substantial factor in the injury to the domestic industry, as
opposed to a merely 'incidental, tangential, or trivial' factor."
Mittal Steel Point Lisas Ltd. v. United States, 542 F.3d 867, 879
(Fed. Cir. 2008)(citing Nippon Steel Corp. v. Int'l Trade Comm'n,
345 F.3d 1379, 1381 (Fed. Cir. 2003)).

including a reasonable response to Plaintiffs' preferred data

from after the POI, that demand declines were largely to blame.

The court will not re-weigh the evidence to reach a contrary

conclusion.

### IV. Capacity

In analyzing any possible threat of future injury from

subject imports, the Commission found that "there appears to be

only limited excess capacity to increase production of wire

decking in China." Final Views 31.[42]

In response, again raising the issue of the Commission's

reliance on questionnaire response data, Plaintiffs claim that

the Commission erred by relying on insufficient responses from

Chinese producers in making its determination regarding Chinese

capacity.  Out of forty-eight firms that received the

Commission's questionnaires, only four Chinese producers,

including Eastfound, the largest, provided responses.

The Commission states that these four responses accounted

for "a substantial majority of Chinese production and Chinese

exports of wire decking to the United States in 2009[.]" Def.'s

Br. 36.[43]  The Commission also notes in its Final Staff Report

that Petitioners and Respondents disagreed over the number of

---

[42] The Commission also concluded that the importers'
inventories of the subject imports were at a "relatively [[
]][.]" Final Views 31.

[43] See supra note 9.

Chinese firms that actually produce wire decking, and that
Respondents believed they had "virtually all of the major
producers" in the response data, and that some of the firms
claiming that they could produce wire decking are actually unable
to do so. Final Staff Report VII-2-VII-3 at nn.3-4.

The Commission concedes that the producers in China are
"export oriented" but states that, since 2008, an increasing
share of these exports have been shifting to third country
markets as opposed to the United States. Final Views 30.[44] The
Commission notes that while "there appears to be substantial
capacity to produce wire decking in China," such capacity
declined over the examined period and was already declining
before this investigation began and before U.S. demand declined
"steeply" in 2009. Final Views 30.

The Commission maintains, as was the case with the importer
questionnaires, that even if the response rate was lower than
reported estimates, it still accounts for a substantial majority
of Chinese production and exports in 2009 and is comparable to
rates received in other investigations. Def.'s Br. 36; Final
Views 30 n.136. Thus, to the Commission, the questionnaire
responses remain the "best available record source" for Chinese
industry information. Final Views 31 n.136. The Commission again

---

[44] The subject producers' exports to the United States went
from [[   ]] percent in 2006 to [[   ]] percent by 2009. Final
Views 30 n.134.

notes, correctly, that it is not required to receive 100%
response compliance.  Id. at 30-31 & n.136.

The Commission adds that, based on its data, product-
shifting was not indicated as a significant factor, nor was there
any indication that exports to the U.S. would increase in the
imminent future.  There were also no other import investigations
pending in other countries at the time.  Id. at 31.  Based on this
information, the Commission concluded that substantial increases
in subject imports to the U.S. were not imminent.  Id.

Plaintiffs contend that numerous other producers that did
not respond were proven to export and sell wire decking, and
possibly could have had excess capacity.  They argue that the
Commission did not conduct sufficient follow-up investigations to
confirm the "voluminous" data Plaintiffs submitted, showing that
these non-responders were in fact producing wire decking and
exporting it to the United States.  Plaintiffs present a summary
of evidence regarding non-responders, including information
regarding fifteen Chinese producers, that they contend proves
that Chinese production of wire decking was much more substantial
than the Commission claimed in its investigation.  See Pl.'s Br.
35-37.[45]  Plaintiffs believe that, had the Commission followed up

_____

[45] The summary of record evidence regarding non-responding
Chinese producers includes five producers who submitted responses
to Commerce reporting wire decking exports, but who did not
submit responses to the Commission; two additional producers
                                              (continued...)

to obtain the missing data from Chinese producers, or had it considered data from other Chinese firms that Petitioners identified, then the Commission would have found greater capacity, and perhaps even excess capacity. Id. at 37. Plaintiffs argue that their identification of aggressive sales efforts, as well as foreign producers' incentive not to inform the Commission for their own financial gain,[46] are a valid basis for the conclusion that much more capacity existed than was considered by the Commission. Id. at 37-38.

Plaintiffs are correct that the Commission cannot ignore significant evidence that contradicts its claims. See Mitsubishi Materials Corp. v. United States, 17 CIT 301, 319, 820 F. Supp. 608, 624 (1993).  The Commission is required to consider all "pertinent evidence" on the record of an investigation before reaching its final result. Roses, Inc. v. United States, 13 CIT 662, 665, 720 F. Supp. 180, 183 (1989)(citation omitted).

_____

[45](...continued)
named by U.S. importers as their source of Chinese wire decking; four additional Chinese producers identified by respondents; two additional producers [[
                    ]]; one additional producer [[
                                    ]]; one additional producer who submitted a preliminary but not a final response; and the Domestic Industry also submitted emails received from other Chinese producers who did not respond to questionnaires and who approached the Domestic Industry with offers to sell them wire decking products. Id. at 36-37.

[46] Plaintiffs contend, and the Commission affirmed, that even the four firms that did report data to the Commission exceeded 100% capacity rates.

Further, "[the Commission] must address significant arguments and evidence which seriously undermines its reasoning and conclusions." Altx, Inc. v. United States, 25 CIT 1100, 167 F. Supp. 2d 1353, 1374 (2001).  The Commission must then disclose its reasoning, explaining how it has used its discretion in making its determination and "articulate a[] rational connection between the facts found and the choice made." Burlington Truck Lines, Inc. v. United States,  371 U.S. 156, 167-68, 83 S. Ct. 239, 245-46 (1962).

Here, however, the Commission discusses various reasons for its determination regarding Chinese capacity, while it gives less weight to Plaintiffs' Chinese production data and more weight to witness testimony.  Therefore, the court cannot conclude that the Commission's determination was unreasonable.  The Commission relied in significant part on the Kedaitis testimony cited above. Specifically, Mr. Kedaitis testified, based on his years of industry experience, visits to the Chinese companies and meetings with their owners,[47] that while some Chinese companies claim they can produce wire decking, in actuality they cannot. Final Staff Report VII-3 n.4; see also Resp'ts Posthr'g Br. App. 1, at 35. Kedaitis listed the various alleged producers, and stated that these companies do not produce wire decking in reality, even if they claim to do so.  He stated that Petitioners' claims greatly

---

[47] See Resp'ts Posthr'g Br. App. 2, at 8 & Attach. IX.

exaggerated what are in fact "minimal imports of subject decks."

Resp'ts Posthr'g Br. App. 2, at 6-16.  Also, Eastfound, the

largest Chinese producer of wire decking, reported that in

February of 2009 it closed one of its two factories, laid off

more than 500 employees and reduced production capacity. Final

Staff Report VII-4 n.6; Def.-Int.'s Br. 8.

     Plaintiffs claim that their evidence is more reliable than

the Commission's.  But it is the Commission's duty to evaluate

the record evidence and determine the credibility of the

submitted evidence, Nevinnomysskiy Azot v. United States, __ CIT

__, 565 F. Supp. 2d 1357, 1374 (2008), even where testimony comes

from an interested party, Negev Phosphates, Ltd. v. U.S. Dep't of

Commerce, 12 CIT 1074, 1091-92, 699 F. Supp. 938, 953 (1988).

> [W]hen the totality of the evidence does not
> illuminate a black-and-white answer to a disputed
> issue, it is the role of the expert factfinder -
> here the majority of the . . . Commissioners - to
> decide which side's evidence to believe. So long as
> there is adequate basis in support of the
> Commission's choice of evidentiary weight, the
> Court of International Trade, and this [appellate]
> court, reviewing under the substantial evidence
> standard, must defer to the Commission.

Nippon Steel Corp. v. United States, 458 F.3d 1345, 1359 (Fed.

Cir. 2006).

### V. Whether the Major Importer was No Longer Operating

     Finally, the Commission stated in its Final Staff Report

that Atlas "ceased operations...and sold its remaining assets to

Worldwide in 2010. Worldwide reports that, to date, it has not

imported subject merchandise and that wire decking is not the

sole focus of its sales and service operations." Final Views 31-

32; Def.'s Br. 37.  The Commission states that this factor made

it unlikely that subject import levels would increase enough to

injure the U.S. industry in the imminent future.  Id.

    Plaintiffs contend that Atlas ceased importing wire decking

only because of the administrative action at issue here and that

Worldwide has only stopped importing in order to avoid paying

dumping duties. Pl.'s Br. 39.  Plaintiffs add that Worldwide's

statements indicate plans to resume selling wire decking in a

fashion similar to its predecessor, Atlas, with similar staffing,

management, locations and contact information. Id. at 39-40; see

also Pet'rs Posthr'g. Br. at 15 & nn.25-26.  Petitioners

submitted record evidence that Kedaitis, the owner of Worldwide

and former manager of Atlas, continued to use three of the same

four Atlas warehouse locations and the same phone number.  In

addition, Worldwide listed wire mesh as a main product and signed

up for a 2011 trade show to promote the product.[48]  Plaintiffs

also submitted evidence of Worldwide's advertising that touted

Worldwide as a "[new] [n]ame...but the people you know." Pet'rs

_____

    [48] Petitioners also stated that [[

                                              ]] Id. at

n.26; see also [[

                        ]].

Posthr'g Br. Ex. 2.

The Commission acknowledges the similar identities of Atlas and Worldwide, Def.'s Br. 37; Final Views 16, but points to evidence indicating that Atlas was paring down its operations, even before the change in ownership, and that Worldwide was not importing subject merchandise. Def.'s Br. 37; Final Views 16; Hr'g Tr. 141-44; Final Staff Report IV-1-IV-3; Resp'ts Posthr'g Br. App. 2, at 1-6. In addition, in its Final Views, the Commission refers to the Final Staff Report, which in turn cites Mr. Kedaitis's report at the Commission hearing that Worldwide had not imported from China since its inception and that its business model differed from Atlas's. Final Staff Report IV-2-3 (PR at IV-1-2); see also Hr'g Tr. at 143, 202.

Mr. Kedaitis testified further that Atlas was affected by the 2008 recession, closing locations, reducing staff and paring down operations. Hr'g Tr. 143; Final Staff Report IV-2. Kedaitis stated that Atlas Lift Truck and Sales, Inc., Atlas's parent company, decided to exit the wire decking business in order to focus on fork lift trucks and other mechanized handling equipment sales. Final Staff Report IV-2 n.4; Def.-Int. Br. 7. The Final Staff Report also indicates that, for Worldwide, wire decking would only be 20 percent of sales, compared to Atlas, for which wire decking was 90 percent of sales. Final Staff Report IV-3 n.8. Mr. Kedaitis stated that Worldwide is a much smaller

company than Atlas with a new business model, Hr'g Tr. 143, and

that Worldwide's focus was sales of pallet rack and repair

equipment services. Hr'g Tr. 169; Resp'ts Posthr'g Br. App. 2, at

2.  Mr. Kedaitis also explained that the advertisement referenced

by Plaintiffs was intended to advertise decks inventory; however,

it was out of context because Worldwide produces a new

advertisement each month in order to move away from wire decking

towards its new business model. Resp'ts Posthr'g Br. App.2, at 3-

6.  Further, Mr. Kedaitis supplemented his claim that the company

was focusing more on pallet rack and repair equipment services by

submitting corroborating advertisements, brochures and website

information. See Resp'ts Posthr'g Br. App. 2, at Attachments VI-

VII.

     Faced with "potentially credible evidence on both sides of

the issue[,]" the Commission has discretion in assigning weight

and ultimately making a determination, as long as its reading of

the record is reasonable. Nippon Steel Corp. v. United States,

458 F.3d 1345, 1358 (Fed. Cir. 2006).  Here again, Plaintiffs

claim that their evidence is more reliable than the Commission's.

However, it is the Commission's duty to make the credibility

determination.  On this record, sufficient evidence exists to

indicate that the Commission made a reasonable choice in its

determination that a major importer of wire decking was no longer

focusing on sales of wire decking.

## CONCLUSION

For all of the foregoing reasons, the Commission's determination is AFFIRMED in all issues.  Judgment will be entered accordingly.

It is **SO ORDERED**

                                    ___/s/___Donald C. Pogue___
                                    Donald C. Pogue, Chief Judge


Dated:     July 12, 2011
           New York, N.Y.

Slip Op. 11-81

UNITED STATES COURT OF INTERNATIONAL TRADE

AWP INDUSTRIES, INC.,
ITC MANUFACTURING, INC.,
J&L WIRE CLOTH, INC.,
NASHVILLE WIRE PRODUCTS MFG. CO.,
INC.,WIREWAY HUSKY CORPORATION,

        Plaintiffs,

             v.

UNITED STATES,

        Defendants,

        – and –

DALIAN EASTFOUND METAL PRODUCTS
CO., LTD., DALIAN EASTFOUND
MATERIAL HANDLING PRODUCTS CO.,
LTD., WORLDWIDE MATERIAL HANDLING
PRODUCTS, LLC,

        Defendant-
Intervenors.

Before: Pogue, Chief Judge

Court No. 10-00250

## JUDGMENT

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

ORDERED, ADJUDGED and DECREED that Plaintiffs' Motion for Judgment on the Agency Record Under Rule 56.2 is DENIED; and it is further

ORDERED, ADJUDGED and DECREED that the International Trade Commission's determinations with respect to China in <u>Wire Decking from China</u>, 75 Fed. Reg. 44,988 (ITC July 30, 2010)(final determinations) are AFFIRMED.

                              /s/   Donald C. Pogue
                         Donald C. Pogue, Chief Judge


Dated:     July 12, 2011
           New York, N.Y.